UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SP INVESTMENT FUND I, LLC,

                              Plaintiff,                Case # 16-CV-6091-FPG

                                                              DECISION AND ORDER

v.

SUSAN MOREHOUSE as executrix of the
Estate of Harold D. Lowry,
and DOES 1 through 10,

                              Defendants.
_____

## INTRODUCTION

This diversity action involves a Purchase and Sale Agreement wherein the late Harold D. Lowry was to transfer to Plaintiff SP Investment Fund I, LLC a partnership interest in Newport Highland Associates, LP.

Plaintiff commenced this action in Los Angeles Superior Court on August 10, 2015, asserting breach of contract and conversion against Susan Morehouse (as Executrix of the Estate of Harold D. Lowry) and Does No. 1 through 10. ECF No. 1. The matter was removed to the U.S. District Court for the Central District of California and later transferred to this Court on February 12, 2016. ECF No. 37.

Now pending before the Court is Defendants' Motion for Summary Judgment. ECF No. 104. After considering the moving papers, the record evidence, and the applicable law, the Court denies Defendants' motion.

## BACKGROUND

The Court draws the following facts from the Local Rule 56 Statements of Material Facts and evidence the parties cite, and it reads them in the light most favorable to Plaintiff.

If a statement of fact is unsupported by record evidence or is premised entirely upon inadmissible evidence it will be disregarded. If a proffered fact that is supported by admissible evidence is disputed only with inadmissible or irrelevant evidence, the Court will treat it as undisputed. *See generally*, *Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that . . . the district court in awarding summary judgment[ ] may rely only on admissible evidence.").

## I. The Parties and Procedural History

Defendant Susan Morehouse is the executrix of the estate of her late father, Harold D. Lowry, who died on October 24, 2014. Plaintiff SP Investment Fund I, LLC is a California limited liability company owned and/or managed by Gil Seton, Jr., a resident of Los Angeles, California. Mr. Seton owns and/or manages multiple other California limited liability companies, including SP Investment Fund LLC and SP Investment Fund III, LLC.

Plaintiff initially brought this action for breach of contract and conversion in the Superior Court of California, County of Los Angeles. Def. Ex. A. The matter was removed to the U.S. District Court for the Central District of California and then transferred to this Court.

On February 24, 2016, Defendants filed an Answer to the Complaint that included the following affirmative defenses: mutual mistake, impossibility or impracticability, and lack of capacity. Def. Ex. B. After initial disclosures, the parties cross-moved for partial summary judgment. ECF Nos. 50, 73. The Court denied both motions without prejudice on March 24, 2017. ECF No. 81. The bulk of discovery, including expert discovery, was completed by June 30, 2017.

## II. Agreement to Transfer Partnership Interest

The Contract at issue purports to assign Mr. Lowry's rights in a New York limited partnership known as Newport Highlands Associates, LP ("the Partnership"). Plaintiff asserts that,

under the Contract, Mr. Lowry only agreed to transfer all or a portion of his partnership interest to the extent necessary approvals were obtained or were unnecessary for the transfer of such portion of the interest. Plaintiff contends that the Contract includes many rights and obligations between Plaintiff and Mr. Lowry that operate regardless of whether Lowry was able to transfer all of his partnership interest or the economic portion of the partnership interest. Def. Ex. C; Pl. Opp'n Stmt. ¶ 12.

Mr. Lowry's wife died before him. Before her death, she and Mr. Lowry jointly owned a limited partnership interest in the Partnership. After her death, Mr. Lowry became the sole owner of that partnership interest.

The Operating General Partner of the Partnership is LDC-NH, Inc., a New York business corporation with principal offices in Rochester, New York ("Operating General Partner").

By letter dated April 5, 2011, Plaintiff made a "Purchase Offer" inviting Mr. Lowry to sell his limited partnership interest. The letter did not contain an offer price. Pl. Ex. B. Plaintiff later sent Mr. Lowry the Contract, which called for transfer of "all of [Lowry's] rights and claims to" the Partnership. Def. Ex. C at 1, 3. On or about April 13, 2011, Mr. Lowry executed the Contract and returned it to Plaintiff. Plaintiff sent Mr. Lowry a check for the agreed-upon purchase price, $2,300, which Mr. Lowry deposited into his bank account.

The Terms and Conditions incorporated into the Contract provide that "[t]he Agreement is entered into in and shall be performed by Seller in Los Angeles, California. The Agreement shall be governed by and construed under the laws of the State of California." Def. Ex. C at 3. The Terms and Conditions mandate that, if any action or proceeding arises from the Agreement, the prevailing party will be entitled to reasonable expenses incurred, including attorney's fees. *Id.* at 4, ¶ 11.

The Terms and Conditions further provide that the assignment of the partnership interest will be effective as of the "Closing Date," Def. Ex. C at 4, ¶ 9 and 2, ¶ 1(t), and that "Closing will occur within five days of satisfaction of the Conditions Precedent." Alternatively, the Terms and Conditions appear to provide that Plaintiff may, by written notice to Lowry, proceed with Closing absent satisfaction of the Conditions Precedent, which require that the "Necessary Approvals have been obtained or have ceased to be necessary." Def. Ex. C at 4, ¶¶ 8, 10. "Necessary Approvals" are "any approvals, consents, or other actions of the Partnership and/or other partners in the Partnership . . . that are necessary for [Plaintiff] to receive, exercise, and/or enjoy the full benefit of all or any portion of the Partnership Interest." Def. Ex. C at 3, ¶ 1(m).

### III. Dispute Regarding Transfer of Partnership Interest

On or about April 12, 2011, Kimberlie Burkhart, the Chief Financial Officer of the Partnership, sent a letter to Mr. Lowry advising him that limited partners may not transfer their partnership interest without the Operating General Partner's consent, and that such consent would not be given. The letter included a copy of a portion of the partnership agreement. Def. Ex. D.

By letter dated April 12, 2011, the Operating General Partner's attorney notified Plaintiff of the restriction on transfer of the limited partners' partnership interests. Namely, that the Operating General Partner's consent was required, and that such consent would not be given. This letter was faxed on April 14, 2011. Def. Ex. E.

On September 15, 2011, Mrs. Morehouse sent a letter to Plaintiff in which she advised Plaintiff as to the restriction on her father's transfer of his partnership interest and that her father was elderly and suffered from dementia. Mrs. Morehouse offered to return the $2,300 that Plaintiff had paid Mr. Lowry. Def. Ex. F.

4

By letter dated January 10, 2012, Mr. Lowry's attorney Robert C. Grossman, Esq. advised Plaintiff as to the restriction on Mr. Lowry's transfer of his partnership interest. Mr. Grossman offered to settle the dispute by returning the $2,300 that Plaintiff had paid Mr. Lowry. Def. Ex. G. Plaintiff does not dispute receipt of this letter. Plaintiff declined the settlement offer.

By letter to Mr. Lowry dated May 15, 2012, Plaintiff acknowledged that "the Necessary Approvals have not yet been obtained or waived and Closing has therefore not yet occurred." Def. Ex. H. Mr. Grossman sent Plaintiff another letter dated May 24, 2012 in which he advised that the "necessary approvals" will never be obtained because the Operating General Partner will never consent. Def. Ex. I.

By letter to Mr. Lowry dated June 29, 2012, Plaintiff advised that it "hereby waives the Conditions Precedent (including but not limited to any Necessary Approvals that have not yet been obtained)," and therefore "the Closing is occurring, effective on the date of this notice (Closing Date)." Def. Ex. J.

On or about July 26, 2012, Mrs. Morehouse, in an attempt to settle, sent Plaintiff a certified check for $2,005 ($2,300 minus the attorney's fees she incurred for Mr. Grossman's letters to Plaintiff). Plaintiff returned that check.

**IV.     Plaintiff's Similar Lawsuit in California Superior Court**

On or about April 9, 2015, Plaintiff, under the name SP Investment Fund III, LLC, brought a similar action in Superior Court of California, County of Los Angeles against William and Joan Zell, other limited partners of the same Partnership. In that matter, the court granted Mr. and Mrs. Zell summary judgment because: (a) California law governs the Contract; (b) under California law, a transfer of a limited partnership interest in violation of a restriction in the partnership agreement is ineffective if the transferee has notice of the restriction at the time of the transfer; and

(c) at the time of the transfer, Plaintiff had notice of the restriction based on a similar letter from Anne Dyring Riley. Def. Ex. K. Plaintiff's appeal from the California Superior Court's grant of summary judgment is currently pending.

**V.     Mr. Lowry's Mental Capacity**

Mrs. Morehouse alleges that, when the Contract was executed, Mr. Lowry lacked the mental capacity to understand it. Mrs. Morehouse, her husband Dr. William Morehouse (Mr. Lowry's treating physician), Dr. Benedetto Tarantino, and Candice Shira (Mr. Lowry's financial advisor), provided deposition testimony as to their observations of Mr. Lowry's mental capacity.

*A.     Mrs. Morehouse's Testimony*

Mrs. Morehouse testified that, from approximately 2007 to 2014, she had power of attorney on Mr. Lowry's behalf and regularly assisted him with activities like cooking, shopping, attending doctor's appointments, and paying bills. Beginning in 2011, she became increasingly involved in assisting Mr. Lowry with his financial affairs. Def. Ex. L. Mrs. Morehouse witnessed signs of Mr. Lowry's mental decline. As early as 2008, Mr. Lowry could not recall the names of elected officials despite reading the newspaper daily. Def. Ex. L at 142-43. Beginning in 2008, Mr. Lowry, who had been an avid reader, started to have trouble following the plot of a book. Def. Ex. L at 78-79. Around 2009, he began having difficulty using his computer. Def. Ex. L at 141.

Mrs. Morehouse testified that Mr. Lowry's dementia made it difficult to participate in hobbies that he had long enjoyed. Beginning in 2008, Mr. Lowry started having difficulty playing bridge, and by 2009 he stopped playing completely. Def. Ex. L at 33-34.  In 2010 and 2011, Mr. Lowry began to demonstrate trouble with cooking, which had been a hobby of his. Def. Ex. L at 50-51.  In 2011 or 2012, Mr. Lowry had difficulty with woodworking, "because he couldn't do the

math, the measuring. He would measure and forget what he measured." Def. Ex. L at 35-36. Dr. Morehouse testified to similar observations regarding woodworking. Def. Ex. N at 24.

Mrs. Morehouse also testified that Mr. Lowry began to have trouble managing his checkbook. Around 2011, she realized that he had been writing duplicative checks for political donations and magazine subscriptions. Def. Ex. L at 77-78. Plaintiff denies that there is any evidence that Mr. Lowry wrote duplicate checks. Pl. Opp'n Stmt. ¶ 43. Mrs. Morehouse testified that beginning in 2012, Mr. Lowry could not remember the names of close family members, which Plaintiff also denies. Def. Ex. L at 144-45; Pl. Opp'n Stmt. ¶ 44.

### B. *Candice Shira's Testimony*

Ms. Shira, Mr. Lowry's financial advisor, testified that, as of late 2010 or early 2011, Mr. Lowry appeared to demonstrate some memory loss or "memory uncertainty." Def. Ex. M at 28-29, 40-42. For example, Ms. Shira had a conversation with Mr. Lowry in which he asked her to make a gift to his children from his retirement account, forgetting that he had already done so. *Id.* at 40. Ms. Shira noticed Mr. Lowry's home was less well-kept and that he was less talkative during their phone calls. *Id.* at 41-42.

Ms. Shira also testified that after 2011,

> there was a general decline both in [Mr. Lowry's] physical health and in his mental health, and that's when he became more and more uncertain of had he written a check or hadn't he. He couldn't remember if he had paid a bill. But by then he had enlisted [Ms. Morehouse's] help to try to help balance a checkbook or to do some of those things.

Def. Ex. M at 44.

Plaintiff submits that Ms. Shira's notes demonstrate that Mr. Lowry had the capacity to make financial decisions in 2011 and 2012. Pl. Opp'n Stmt. ¶¶ 45-46; Pl. Ex. P. The notes indicate

that "he's doing well but I can tell he's a little bit confused about whether he's gifted to the kids in 2011, etc [sic] so I reviewed it with him." Pl. Ex. P.

    *C.    Dr. William Morehouse's Testimony*

Dr. Morehouse testified that after Mrs. Lowry died in 2007, he periodically assisted Mr. Lowry. Def. Ex. N. Beginning in 2008, he observed that Mr. Lowry had difficulty remembering or understanding things. For example, Mr. Lowry began to have difficulty using his computer. Def. Ex. N at 21. Dr. Morehouse also testified that, at a yard sale in 2008, Mr. Lowry would sell an item and then shortly thereafter become irritated that it had been sold, apparently forgetting that he agreed to do so. Def. Ex. N at 22.

In 2010, Dr. Morehouse helped Mr. Lowry buy a car:

> [W]hen it [sic] went to doing the paperwork to make this sale, [Mr. Lowry] basically sat there. And I would ask him and he—I recognized there's no way that this man could have made this transaction by himself without somebody there at his side checking it over, explaining it to him, asking him if this is what he wanted. He was in no position to really advocate for himself. A month later he was supposed to bring it back to have it checked because it was a warranty thing and they were supposed to check it. He didn't know where the dealer was. He couldn't find it.

Def. Ex. N at 29-30. Based on that experience, Dr. Morehouse "would be flabbergasted if anyone thought [Mr. Lowry] was capable of understanding a complicated legal document." Def. Ex. N at 40.

    *D.    Dr. Benedetto Tarantino's Testimony*

Dr. Tarantino was Mr. Lowry's primary care physician from 1995 through Mr. Lowry's death in 2014. Def. Ex. O. Dr. Tarantino first diagnosed Mr. Lowry with age-related memory loss in 2005. Def. Ex. O at 19-21. On January 12, 2011, Mrs. Morehouse contacted his office to report that "she was seeing a lot of changes in [Mr. Lowry's] behavior and functional status and that she

8

requested that [Dr. Tarantino] do another mini-mental status exam on his next appointment." Def. Ex. O at 39. When Dr. Tarantino saw Mr. Lowry on January 19, 2011, Mr. Lowry stated that he was becoming more forgetful. Def. Ex. O at 41.

On or about January 26, 2011, Mr. Lowry had a head CT scan that revealed "white matter changes, which are nonspecific in nature, but likely represents sequelae of chronic small vessel ischemic changes." Def. Ex. O at 46. Dr. Tarantino testified that "[b]ased on the CT scan showing small vessel ischemic changes, [he] was concerned that that was affecting [Mr. Lowry's] functional status." Dr. Tarantino diagnosed Mr. Lowry with mild dementia. Def. Ex. O at 51. Dr. Tarantino explained that a diagnosis of mild dementia is "based on what a patient exhibits in his functioning. Someone who has slightly poor judgment, someone who has slight memory loss could be categorized as having mild dementia." Def. Ex. O at 51-52.

As of February 8, 2011, Dr. Tarantino had "concerns" that Mr. Lowry "was unable to make decisions," "was somewhat confused regarding his medications," and "had some cognitive and functional impairment with regards to memory and judgment." Def. Ex. O at 52-53.

At a February 8, 2011 visit, Dr. Tarantino prescribed Mr. Lowry Aricept, a medication to treat Alzheimer's-related dementia. Mr. Lowry did not tolerate Aricept well, so on April 27, 2011, Dr. Tarantino prescribed Namenda, a similar medication. Def. Ex. O at 45, 62-64.

Dr. Tarantino testified,

> I think input from family is vital. You don't know what the patient is doing outside your office, you know, the 15 or 30 minutes that he's there. You don't know what he's doing on a day-to-day basis, how he's functioning on a day-to-day basis. You need that information from family members and other people to give you a complete picture of what's going on.

Def. Ex. O at 116-17.

9

## VI. Expert Testimony

### A. *Plaintiff's Expert: Dr. Kevin R. McCormick*

Plaintiff engaged Dr. McCormick as an expert witness regarding Mr. Lowry's mental capacity. Based on a review of Mr. Lowry's medical notes and test results and of Dr. Tarantino's deposition transcript,[1] Dr. McCormick concluded that, while Mr. Lowry "may have had some cognitive impairment during the period in question," he "did not lack the capacity to make the financial decision in question." Def. Ex. P at 2. He noted that two mini-mental state examinations ("MMSE") performed six years apart were in the normal range. *Id.* at 3.

Dr. McCormick testified that "[c]apacity means that a patient understands the consequences of a decision or action. And capacity is specific to a given question. The patient may have the capacity to make one decision and not another." Def. Ex. Q at 15-16.

Dr. McCormick testified that input from a patient's surrogates—people in regular contact with a patient, like family members—is often important to determine a patient's mental capacity. Def. Ex. Q at 30-34. He further testified that input from individuals like Mrs. Morehouse, Dr. Morehouse, or Candice Shira, could have been relevant to his determination regarding Mr. Lowry's mental capacity. Def. Ex. Q at 86-89. Dr. McCormick did not speak with these individuals or review their deposition testimony.

Dr. McCormick also testified that, to determine whether a person has the mental capacity to understand the consequences of a particular decision, he needed information about the particular decision at issue. Def. Ex. Q at 157-58. If the complexity of a document makes the consequences of signing it unclear, then that fact could affect a person's capacity to understand the relevant consequences. Def. Ex. Q at 168. Dr. McCormick did not review the Contract at issue here. *Id.* at

---

[1] Dr. McCormick clarified during his deposition that his opinion report erroneously stated that he reviewed Mrs. Morehouse's deposition transcript. Def. Ex. Q at 9.

15, 63. He testified, however, that he did not believe it would have been helpful for him to see the Contract before rendering his opinion. *Id.* at 171.

Dr. McCormick testified that input from Dr. and Mrs. Morehouse and Ms. Shira "might" have provided insight into Mr. Lowry's familiarity with documents like the Contract, but that he could not speculate. *Id.* at 173.

  B. *Defendant's Expert: Dr. Gary J. Horwitz*

Defendant engaged Dr. Horwitz as an expert witness regarding Mr. Lowry's mental capacity. Def. Ex. R. Dr. Horwitz's report states: "[w]ith a reasonable degree of medical certainty, at the time of the sale of the limited partner interest of Newport Highlands Associates to S.P. Investment Fund, Harold D. Lowry was substantially impaired in his executive function due to major neurocognitive disorder of Alzheimer's disease." Def. Ex. R at 1.

During his deposition, Dr. Horwitz opined that Mr. Lowry lacked mental capacity to enter into the Contract in April 2011:

> [Mr. Lowry] did not have the requisite capacity in executive functioning to appreciate the import and ramifications of his decision. And that is due to his having typical history of onset and gradual decline of his executive functions consistent with his identified memory problems and constriction, increasing constriction in range of activities.

Def. Ex. S at 207.

Dr. Horwitz defined capacity as having "the requisite mental and emotional and functional actions necessary to make an evaluation and understand, to reason, to be able to consider options and appreciate the import and results of such a decision." Def. Ex. S at 67-68. He based his opinion on interviews with Mrs. Morehouse and review of Mr. Lowry's medical records, Dr. Tarantino and Ms. Shira's deposition testimony, correspondence from Plaintiff to Mr. Lowry, and the Contract. Def. Ex. R at 1.

With regard to input from other individuals who have close contact with a patient, Dr. Horwitz stated,

> . . . a doctor sees the person periodically in a very artificial situation. They're not observing their day-to-day functioning. It's a short contact and the amount of information gathered is relatively—it's a small snippet. It's a little snapshot at that particular moment. And from the family and people that are—have day-to-day contact and regular contact is a much richer description of their behavior and actions and functioning over time frames.

Def. Ex. S at 233.

Dr. Horwitz testified that a person's mental capacity is relative to a specific decision, and that the complexity of the decision is significant to a capacity determination. Def. Ex. R at 4; Def. Ex. S at 237-38. On that point, Dr. Horwitz testified that he could not have rendered an opinion as to Mr. Lowry's capacity with a reasonable degree of medical certainty if he had not reviewed the Contract. Def. Ex. S at 235-37.

## VII. Additional Facts

Plaintiff filed an "Alternate Statement of Facts" in connection with its opposition to the pending summary judgment motion (ECF No. 108-5 at 11-13), which includes the following facts:

In April 2011, Mr. Lowry had $414 of carryover loss, which would have expired within one year of 2011 and, thus, Mr. Lowry would have been obligated to pay income taxes on phantom income that he would be receiving from his interest in Newport Highlands partnership. Pl. Ex. DD at 17-18. Mr. Lowry took responsibility for previewing all of the materials that were necessary for his accountant to prepare the 2010 Income Tax Returns in 2011. *Id.* at 15.

Mr. Lowry lived independently in a patio home from 2008 to 2012. Pl. Ex. X at 8-10. In 2011, he had no need to use the call button available to him in case of emergency. Def. Ex. Y. He was mentally competent to create a new will in 2013. Pl. Ex. FF.

In 2013, Mr. Lowry entered into an agreement with his children in which he gave a car to his son and deducted $4,000 of the value of the car from his son in making his annual distributions. Pl. Ex. R. Mr. Lowry drove his car until 2013 and neither his daughter, who had his Power of Attorney, nor his son-in-law tried to stop Mr. Lowry from driving. Pl. Ex. O at 57. Mr. Lowry was able to live independently in his patio home and apartment without any live-in aides other than when he was physically disabled from operations. Pl. Ex. Q at 64.

Mr. Lowry decided, with his financial advisor's help, to make major gifts to his children as part of his estate planning and, in January 2011, wrote major gifts to his children that they accepted. Mr. Lowry made $136,000 in gifts from 2010 to 2014. Pl. Ex. Q at 75-76.

Mr. Lowry received an offer of $2,300 to purchase his half interest as a limited partner in Newport Highlands partnership from Mr. Seton. Pl. Ex. Q at 180.

A new MMSE was performed on February 8, 2011, and Mr. Lowry scored 28 out of 30, within the normal limits indicating no cognitive impairment. Pl. Ex. OO. According to the MMSE guidelines, a score of 25 to 30 indicates no cognitive impairment.

In summary, the primary disputed issue on this motion is whether Mr. Lowry had the requisite capacity to enter into the Contract in question.

## DISCUSSION

### I. Exclusion of Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable

principles and methods; and (d) the expert has reliably applied the
principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under Rule 702, the trial court acts as a gatekeeper. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The district court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). Nevertheless, "[i]t is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions." *Nimely v. City of N.Y.*, 414 F.3d 381, 395 (2d Cir. 2005).

## II. Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Sousa v. Roque*, 578 F.3d 164, 169 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id*. The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56).

To defeat summary judgment, therefore, nonmoving parties "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and they "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted). At the summary judgment stage, a nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. N.Y.C.*, 132 F.3d 145, 149 (2d Cir.1998).

Defendants move to exclude the testimony of Plaintiff's expert, Dr. McCormick, and for summary judgment on the basis that the Contract was void because of mistake, illegality, and/or Mr. Lowry's mental incapacity. Def. Mem. 1-15. The Court deals with each request in turn.

### A. Dr. McCormick's Testimony

During the course of this litigation, Plaintiff retained Dr. McCormick to render an expert opinion as to Mr. Lowry's mental competence. Dr. McCormick issued a report and testified at a deposition. Def. Exs. P & Q. Defendants now move to exclude his testimony pursuant to Rule 702, because it is not based upon reliable data and is irrelevant or otherwise insufficiently tied to the facts of the case. Def. Mem. 9-10. Specifically, Defendants argue that the testimony should be excluded because Dr. McCormick did not consider input from Mr. Lowry's friends and family or review the Contract in forming his opinion. *Id.*

"Rule 702 embodies a liberal standard of admissibility for expert opinions, representing a departure from the previously widely followed, and more restrictive, standard of *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923)." *Nimely*, 414 F.3d at 395 (citing *Daubert*, 509 U.S. at 588). The Court assumes a gatekeeper function to determine whether "the expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. A trial court "has broad discretion to carry out this gatekeeping function." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016). "As the Second Circuit has noted, district courts should presume

expert evidence is reliable." *UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d 453, 456 (E.D.N.Y. 2007) (citing *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)).

Here, Dr. McCormick reviewed the following before rendering his opinions: two MMSEs; medical records from Dr. Tarantino; White Pines Medical Group notes summarizing telephone conversations with Mrs. Morehouse regarding Mr. Lowry's health; Mr. Lowry's certificate of death; letters from Dr. Tarantino presenting Mr. Lowry's prognosis and treatment; University of Rochester Medical Center records; correspondence from Dr. Tarantino to Mrs. Morehouse dated September 10, 2015; results of a head CT scan performed on January 26, 2011; correspondence regarding a cardiac evaluation dated February 25, 2011; notes written by Mr. Seton and Ms. Shira; and Dr. Tarantino's deposition transcript. Def. Ex. P.

The parties do not dispute Dr. McCormick's qualifications or the relevance of his opinion—only whether the opinion is unreliable because he did not review the Contract in question or consider input from Mr. Lowry's friends and family. Defendants' objection goes to the weight, not the admissibility, of Dr. McCormick's opinion. As such, the remedy is to introduce additional evidence and cross examination. *See Adesina v. Aladan Corp.*, 438 F. Supp. 2d 329, 343 (S.D.N.Y. 2006).

Both parties have proffered experts to testify on this matter. Moreover, Dr. McCormick testified that he did not believe that reviewing the Contract would have changed his opinion. Thus, the Court finds that Dr. McCormick's opinion should not be excluded, and Defendants' motion in this regard is denied.

  *B.    Choice of Law*

In general, a federal district court must apply the choice-of-law rules of the state in which it sits. *Eggleton v. Plasser & Theurer Export Von Bahnbaumaschinen Gesellschaft, MBH*, 495

F.3d 582, 585 (8th Cir. 2007); *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). "This rule is not absolute, however. For example, if a district court in one state transfers an otherwise properly filed case to a district court in another state solely '[f]or the convenience of parties and witnesses,' 28 U.S.C. § 1404(a), the transferee court applies the choice-of-law rules of the state in which the transferor court sits." *Eggleton*, 495 F.3d at 585-86 (quoting *Ferens v. John Deere Co.*, 494 U.S. 516, 531 (1990)).

This diversity case, involving a California plaintiff and New York defendant, was first brought in California state court and later removed to the Central District of California and transferred to this District. The Court therefore applies California laws, including California's choice of law rules. *See Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604 (2d Cir. 1996) (stating that "where . . . a case is transferred from one federal jurisdiction to another at the behest of the defendant pursuant to 28 U.S.C. § 1404, 'a transferee court applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed'") (quoting *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993)).

### C. *Validity of the Contract*

Defendant argues that summary judgment is warranted because the Contract is void due to Mr. Lowry's mental incapacity. Def. Mem. 14. Plaintiff contends that a genuine issue of fact exists as to whether Mr. Lowry was incompetent to enter into the Contract. Pl. Mem. 14.

To form a valid and enforceable contract under California law, there must be "(1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) a sufficient consideration." *Netbula, LLC v. Bindview Dev. Corp.*, 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007) (citing Cal. Civ. Code § 1550). The party asserting lack of capacity has "the burden of proving that they lacked mental capacity and/or that they were unduly influenced." *Burgoon v. Narconon of N. California*,

17

No. 15-CV-01381, 2016 WL 192536, at *2 (N.D. Cal. Jan. 15, 2016), *appeal dismissed* (9th Cir. Apr. 22, 2016). "Regarding capacity to contract, '[a] person entirely without understanding has no power to make a contract of any kind.'" *Id.* (citing Cal. Civ. Code § 38). "In addition, a contract made by 'a person of unsound mind, but not entirely without understanding,' may be rescinded." *Id.* (citing Cal. Civ. Code § 39(a)). "A rebuttable presumption affecting the burden of proof that a person is of unsound mind shall exist . . . if the person is substantially unable to manage his or her own financial resources or resist fraud or undue influence." Cal. Civ. Code § 39(b).

"A determination that a person is of unsound mind or lacks the capacity… to contract… shall be supported by evidence of a deficit in" alertness and attention, information processing, thought processes, or ability to modulate mood and affect. Cal. Prob. Code § 811(a)-(b). A deficit in any of these mental functions "may be considered only if the deficit . . . significantly impairs the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question." *Id.* "In other words, a person is of unsound mind or lacks the capacity to contract only when he or she is not able to understand the nature and effect of the transaction." *Burgoon*, 2016 WL 192536, at *2.

To this end, Defendants have produced four fact witnesses and an expert whose testimony tends to show that Mr. Lowry could not manage his financial affairs in April of 2011. Plaintiff, in contrast, submits expert testimony and evidence tending to show that Mr. Lowry had sufficient capacity to enter other transactions after 2011, like revising his will and making substantial gifts to his children.[2]

---

[2] The Court is mindful that "the determination of a person's mental capacity is fact specific, and the level of required mental capacity changes depending on the issue at hand . . . . [M]ental capacity can be measured on a sliding scale, with marital capacity requiring the least amount of capacity, followed by testamentary capacity, and *on the high end of the scale is the mental capacity required to enter contracts*." *In re Marriage of Greenway*, 217 Cal. App. 628, 639 (4th Dist. 2013) (emphasis added).

"The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). Thus, viewing the evidence in the light most favorable to Plaintiff, a genuine issue of fact exists as to Mr. Lowry's capacity to enter the Contract.[3]

Because the Court finds that there is an issue of fact as to whether Mr. Lowry was capable of contracting—a necessary element of a valid and enforceable contract under California law—it need not reach the affirmative defenses of mutual mistake and impossibility or impracticality.

## CONCLUSION

For the reasons stated, Defendant's Motion for Summary Judgment (ECF No. 104) is DENIED. The Court will issue a separate order with the date and time the parties must appear to set a trial date. At that time, counsel should be prepared to discuss the scope of the issues for trial and the trial schedule, including its expected duration.

IT IS SO ORDERED.

Dated: September 10, 2018
      Rochester, New York

 

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court

---

[3] Indeed, Defendants appear to concede as much. *See* Def. Mem. 15 ("[W]hether or not Mr. Lowry had the capacity to enter the contract clearly remains in dispute.").